**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

VIRGIL VAN STELTON, et al.,

    Plaintiffs,

vs.

JERRY VAN STELTON, et al.,

    Defendants.

No. C11-4045-MWB

*ORDER
IMPOSING SANCTIONS*

_____

### TABLE OF CONTENTS

I.  INTRODUCTION ................................................................. 2

II.  BACKGROUND ................................................................. 2

III.  DeKOTER'S DEPOSITION ............................................... 8

IV.  WEBER'S DEPOSITION ................................................. 22

V.  ANALYSIS ....................................................................... 29
  A.  *Introduction To Appropriate Deposition Behavior* ......................... 29
  B.  *The Explanations* ................................................ 31
  C.  *Did DeKoter And Weber Violate The Rules Of Procedure?* ............. 32
  D.  *What Is The Appropriate Relief?* ............................... 35
    1.  *New Depositions* ......................................... 35
    2.  *Joint Expenses Of The New Depositions* ........................... 37
    3.  *Separate Expenses Of The New Depositions* ........................ 38
    4.  *Attorney Fees Incurred In Preparing The Motions For Sanctions* ............................................ 38
  E.  *Plaintiffs' Request For Contempt Sanctions* ................................ 39

VI.  CONCLUSION ................................................................. 39

*"With all due respect, I am the client, and I'm in charge." – Defendant Daniel DeKoter, while refusing to answer questions during his deposition.[1]*

## I.    INTRODUCTION

Plaintiffs have filed two motions for discovery sanctions and contempt sanctions – one against defendant Daniel DeKoter (Doc. No. 131) and one against defendant Douglas Weber (Doc. No. 133). Both motions are based on refusals to answer questions about certain topics during depositions. Weber and DeKoter have filed resistances (Doc. Nos. 147 and 150). While plaintiffs have requested oral argument, I find that oral argument is not necessary. *See* Local Rule 7(c). As set forth below, the behavior by the witnesses and/or their counsel was so obviously improper that oral argument would serve only to cause further expense and delay.

## II.    BACKGROUND

Many prior orders have described this case's rather-complex background in great detail. *See, e.g.,* Doc. 105 and 128. I will recite background here only to the extent necessary to establish context relevant to the present motions.

***Plaintiffs' Current Claims.*** The defendants filed motions to dismiss various claims in this case (which are currently described in the third amended complaint). Weber, along with defendants Scott Gries, Nate Krikke, Robert Hansen and Osceola County, Iowa (collectively the County defendants) sought dismissal of Count II (RICO) as to all plaintiffs; Count V (slander and libel) as to plaintiff Carol Van Stelton; and Count VI (tortious interference with prospective business relations) as to all plaintiffs. Meanwhile, DeKoter and his law firm, defendant DeKoter, Thole, and Dawson, P.L.C. (the Law Firm defendants), sought dismissal of all claims against them.

---

[1] *See* Transcript of the August 19, 2013, deposition of Daniel DeKoter, filed herein as Doc. No. 135-1 (DeKoter Tr.), at 11

On July 17, 2013, Judge Bennett ruled (Doc. No. 105) on the motions to dismiss. Judge Bennett granted the motions with regard to certain claims but denied them with regard to others. At the conclusion of the ruling, he provided the following summary of the outcome with regard to claims against the County defendants and the Law Firm defendants:

1.  The County defendants' motion to dismiss is granted, and the following claims against the County defendants are dismissed:

    a.  the RICO claim;

    b.  the First Amendment right to petition claim;

    c.  Carol Van Stelton's slander and libel claim;

    d.  the tortious interference with prospective business relations claim;

    e.  the Iowa Ongoing Criminal Conduct (OCC) claim.

2.  The Law Firm defendants' motion to dismiss is granted in part and denied in part, as follows:

    a.  That part of the motion seeking dismissal of the § 1983 claims against DeKoter is denied;

    b.  That part of the motion seeking dismissal of the § 1983 claims against the Law Firm is granted;

    c.  That part of the motion seeking dismissal of the RICO claims is granted;

    d.  That part of the motion seeking dismissal of Virgil Van Stelton's false arrest claim is denied;

    e.  That part of the motion seeking dismissal of the malicious prosecution claim is denied;

f.   That part of the motion seeking dismissal of the
     defamation claim against them is granted;

g.   That part of the motion seeking dismissal of the
     tortious interference with prospective business
     relations is denied;

h.   That part of the motion seeking dismissal of the fraud
     claims is granted;

i.   That part of the motion seeking dismissal of the
     breach of fiduciary duty claim is denied;

j.   That part of the motion seeking dismissal of the OCC
     claim is granted.

Doc. No. 105 at 55-56.

In denying the motion to dismiss plaintiffs' Section 1983 claim against DeKoter,

Judge Bennett explained plaintiffs' allegations as follows:

> [P]laintiffs allege that DeKoter controls and directs a symbiotic
> relationship with [Osceola County Attorney Robert] Hansen and [Osceola
> County Sheriff Doug] Weber. In this relationship, DeKoter directs
> Hansen and Weber to selectively enforce criminal laws and ordinances to
> benefit the Law Firm's clients and used their official positions to suppress
> local political activities in order to maintain the balance of power within
> the county. In return for their actions, Hansen and Weber are rewarded
> with excessive compensation. Their overcompensation is allegedly assured
> through DeKoter's law partner's advice to the Osceola County Board of
> Supervisors in his role as its compensation counsel. Plaintiffs specifically
> allege that DeKoter orchestrated Virgil [Van Stelton]'s false arrest with
> County Attorney Hansen as a pretext to seize Virgil's tape recorder.
> Thus, plaintiffs allege a concerted plan between DeKoter and the County
> defendants to violate due process rights. Taking these allegations of joint
> activity as true, they are sufficient to make DeKoter a state actor liable
> under § 1983. . . . This portion of the Law Firm defendants' motion to
> dismiss is denied as to DeKoter.

*Id.* at 21-22 [emphasis added; citations omitted].

4

Earlier in his ruling, Judge Bennett explained that the "local political activities" DeKoter allegedly sought to suppress involved Osceola County's "Unified Law." Plaintiffs allege that Osceola County allocates its real estate tax proceeds under the Unified Law. They further allege that the Law Firm's predecessor entities were instrumental in the County's implementation of the Unified Law. While the County's rural taxpayers allegedly pay the majority of the County's property taxes, the Unified Law has allegedly been administered to "provide disproportionate benefits" to the City of Sibley (which is the county seat) and disproportionate funding of Osceola County's central administration. Plaintiffs allege that the Unified Law continues to be followed in Osceola County even though it has been repealed or its term has expired. They contend that Sibley's taxpayers benefit from the Unified Law by receiving a disproportionate allocation of tax funding.[2] For that reason, allegedly, residents of Sibley support the Unified Law in order to maintain a reduced tax burden. Doc. No. 105 at 5.

Plaintiffs allege that some of the County's rural residents have formed an organization called Osceola County Taxpayers Association (OCTA) to investigate and challenge the Unified Law. They contend that all three plaintiffs have been known to associate with OCTA and that plaintiff Virgil Van Stelton is active in the organization. Meanwhile, they allege, DeKoter has actively and publicly opposed OCTA and its objectives. They contend that DeKoter has used his relationship with Weber (the Sheriff) and Hansen (the County Attorney), along with his own status as attorney for a Van Stelton family trust, to punish the plaintiffs for their political activities in opposition to the Unified Law. Among other things, plaintiffs contend DeKoter caused Alvin Van Stelton to be removed as a trustee of the family trust and caused the false

---

[2] In later filings, plaintiffs have noted that on April 30, 2013, the State Appeal Board of Iowa issued an order finding that the Osceola County Public Safety Commission has demonstrated an "egregious and habitual" lack of compliance with Iowa law in its administration of tax proceeds pursuant to the Unified Law. *See, e.g.,* Doc. No. 113-1.

5

arrest of Virgil Van Stelton. They also contend that DeKoter took, or directed, various actions as part of a scheme to prevent Virgil and Alvin from inheriting land and realizing income from the family trust. *Id.* at 10-12, 45-46.

Of course, these are all just allegations. I take no position as to their merit. However, Judge Bennett found the allegations to be sufficient to overcome DeKoter's motion to dismiss several claims, including the Section 1983 claim and claims for false arrest, malicious prosecution and tortious interference with prospective business advantage. Moreover, as noted above, neither Weber nor the other County defendants even sought dismissal of the remaining claims. All of these claims were pending on August 19 and 20, 2013, when DeKoter and Weber were deposed.

***The Counterclaim.*** On July 31, 2013, Weber and the other County defendants filed an answer (Doc. No. 108) to the third amended complaint, along with a counterclaim against plaintiffs. In the counterclaim, the County defendants allege that various claims in the third amended complaint are frivolous and that plaintiffs filed that document for an improper purpose. The County defendants further allege that they have been injured by the plaintiffs' alleged abuse of process and seek an award of actual and punitive damages. While plaintiffs have moved to dismiss the counterclaim, it remains pending and was part of the case when Weber was deposed.[3]

***The Pre-Deposition Motions.*** On August 8, 2013, the County defendants filed a motion (Doc. No. 109) to quash subpoenas and for a protective order. On August 9, 2013, the Law Firm defendants filed a similar motion (Doc. No. 111). The motions noted that depositions of DeKoter, Weber and Hansen were scheduled for August 19, 20 and 21 and that plaintiffs' counsel had recently served deposition subpoenas on the deponents that included demands for the production of documents. The motions asked that the subpoenas be quashed. The motions further requested entry of a blanket protective order declaring that certain topics, including "issues surrounding funding and

---

[3] The Law Firm defendants filed a separate answer (Doc. No. 106) to the third amended complaint but did not file a counterclaim against plaintiffs.

administration of the unified law," be placed off-limits during the depositions and all other discovery in this case. *See* Doc. No. 109-1 at 4-5, Doc. No. 111-1 at 4.

I addressed the motions on an expedited basis and conducted a telephonic hearing on August 16, 2013. I entered an order (Doc. No. 119) on the same day. I granted the motions with regard to the document requests contained in the subpoenas, pointing out that any attempt to obtain documents from a party in connection with a deposition is governed by Rule 34, which provides a 30-day period of time for responding. Doc. No. 119 at 2. Because plaintiffs attempted to circumvent this rule with subpoenas served less than 30 days before the depositions, I quashed those subpoenas "to the extent they purport to require defendants Weber, Hansen and Dekoter to produce documents at their depositions on August 19, 20 and 21." *Id.*

However, I denied defendants' anticipatory request for entry of an order limiting the scope of questioning during the depositions. I deemed the request to be premature and explained:

> With regard to the scope of questioning at the upcoming depositions, all parties know which claims and allegations are currently part of this case. And, of course, the scope of permissible discovery is broad. Fed. R. Civ. P. 26(b)(1). Reasonable people can, and often do, disagree as to the relevance of specific information in the course of discovery. For the most part, even if counsel for a deponent is convinced that a question seeks irrelevant information, the correct course of action is to allow the witness to answer. An attorney may "instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." *See* Fed. R. Civ. P. 30(c)(2). A motion under Rule 30(d)(3) is appropriate only when a deposition "is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." *See* Fed. R. Civ. P. 30(d)(3).
>
> At this point, it is simply not prudent or proper for me to give advisory opinions as to which questions, or topics, might or might not be appropriate during the depositions. If any attorney determines, in good faith, that a motion under Rule 30(d)(3) is necessary, then he or she can instruct the deponent not to answer the question or questions at issue. The

examination should then move on to other topics, with the motion being presented as soon as practicable after the deposition. At that point, at least, there will be a record with one or more specific questions about which the parties may present arguments. Of course, if the motion is denied, and the question(s) at issue deemed appropriate, the examining party would be allowed to reconvene the deposition, most likely at the deponent's expense.

*Id*. at 2-3. With this guidance (which, even in hindsight, I find unambiguous), the depositions took place as scheduled the following week.

## III. DEKOTER'S DEPOSITION

DeKoter's deposition on August 19, 2013, was the first of the three. Plaintiffs were represented during the deposition by their counsel of record, Wendy Nora and Thomas Frerichs. DeKoter was represented by his attorney of record, James Redmond. DeKoter Tr. 3. DeKoter testified that he has practiced law in Sibley for 33 years, that he is licensed to practice law in Iowa and that he is admitted to practice in this court. *Id*. 6-7, 25. Minutes after his deposition commenced, the following exchange occurred:

> Q [By Ms. Nora]    Thank you. Now, tell me what you know about Don Skiver's relationship to what is called unified law locally in Osceola County.
>
> A    Unified law isn't in this case anymore, ma'am.
>
> Q    I'm sorry, sir. You are represented by counsel. If you have an objection, then your counsel is going to have to make the objection.
>
> A    No, ma'am. No, ma'am. I'm not going to answer questions about unified law today. It's not in this case.
>
> MS. NORA: Is that your position, Mr. Redmond?
>
> MR. REDMOND:  You heard the witness.

MS. NORA: I'm afraid I'm going to have to have counsel make the objection for the record.

MR. REDMOND: I don't think so.

Q     Okay. Let's talk about why you think unified law is -- I think my co-counsel wants to confer on this.

(Discussion held off the record between Ms. Nora and Mr. Frerichs.)

MS. NORA: Is it counsel's position for the witness that counsel is not interposing an objection to the question that I posed?

MR. REDMOND: I haven't made an objection.

MR. FRERICHS: Here's the thing that I'm concerned about. In the magistrate judge's last order it said that if you are going to object and not answer a question, that counsel needed to object and advise the person not to answer the question. If we're not going to follow that procedure, I think that we probably should get Judge Bennett[4] involved sooner rather than later so we don't have to deal with it again.

THE WITNESS: With all due respect, I am the client, and I'm in charge.

MR. FRERICHS: I understand that, but that's not what Judge Strand's order is. That's all I'm saying. I think procedurally we need to follow Judge Strand's order.

THE WITNESS: I don't think he ordered anything.

MR. FRERICHS: I think he set forth a pretty clear procedure as for what we do. Quite frankly, I don't think any of us want to get Judge Bennett involved in this thing, but if we have to, we have to.

---

[4] During the August 16, 2013, telephonic hearing, I advised counsel that my schedule would not permit me to resolve issues by telephone during the depositions but that they could attempt to reach Judge Bennett if they deemed it necessary to seek the court's immediate intervention.

MR. REDMOND:  That's your prerogative.

MS. NORA: I think he meant at this particular moment, so early on. We would like to develop more of a record here so that we don't call on every dispute that may come forward here.

MR. REDMOND:  I understood his statement.

MS. NORA: Thank you.

MR. REDMOND: I also participated along with you in the hearing, and I understood perfectly what Judge Strand was saying.  Now, you're entitled to contact Judge Bennett, whatever you want to do. Mr. DeKoter has told me in no uncertain terms he does not intend to get into the 28E[5] issues. So, you know, you have your options. You can continue with the deposition, or get Judge Bennett, or go into the other issues, or however you choose to proceed. I'm not telling you what to do or how to do it.

MR. FRERICHS:  I guess what I'm saying is I think there has to be some kind of advice of counsel involved in the thing and, of course, we're not entitled to know that, but I think that he's got to -- he has got to advise his counsel. I think counsel has got to then say, hey, I'm advising him not to answer it.

MS. NORA: In other words, we would like to hear your objection, and then we would like you to instruct your witness not to answer. You're smiling and shaking your head.

MR. REDMOND: I don't think I have to make a record beyond what I already have. I mean, I understand what you would like me to do, but it's not going to happen, so you have options available to you. You can proceed with the deposition on the issues that are covered, or not do so.

*        *        *

---

[5] References to "28E" are to Iowa Code chapter 28E, entitled "Joint Exercise of Governmental Powers."  The Unified Law is administered under a Chapter 28E agreement.  *See, e.g.,* Doc. No. 113-1 at 2.

MS. NORA: But you're saying that – your position is that those issues are not before the Court. Our position is that they are. So should we have a general objection to any 28E questions that we would reopen the deposition to proceed upon? You could have a standing objection, but I would still like to get the specific questions on the record. So far counsel is not objecting. The witness is objecting.

MR. REDMOND: I'm not going to tell you how to proceed with your deposition.

MR. FRERICHS: Judge Strand's order basically said that an attorney may instruct a deponent not to answer only when necessary to preserve a privilege, enforce a limitation, or ordered by the Court, or present a motion under Rule 30(d)(3). So I guess what we're asking is, what's the basis? Is it to enforce a privilege? To enforce a limitation by court order? Or is it to present a motion under rule 30D3?

THE WITNESS: I'm objecting. Not the attorney. So what he says there doesn't apply to me. I'm the witness. Secondly, what you need to understand is that –

MS. NORA: Just –

THE WITNESS: I'm entitled to finish here, I think. First of all, it's not part of the case. It's not relevant. Secondly, you are doing this solely for purposes of harassment of me. This whole lawsuit is about that. And I do think –

MS. NORA: Who is you? When you said you are doing this, who is you?

THE WITNESS: You, and you, and them (indicating).

MS. NORA: So everyone who is proceeding in this lawsuit, counsel and the plaintiffs have brought this lawsuit just to harass you, Mr. DeKoter?

THE WITNESS: No. I think you have financial motivations, too, ma'am. I don't care to get into that, but the objection I was making was, I also think that inquiry into my exercise of my political rights, my free speech rights, which is what you intend to do, would violate –

11

MS. NORA: How do you know what I intend to do?

THE WITNESS:    -- would violate my 1st amendment rights. That's where I'm at. I'll shut up. Sorry.

Q       Are you asserting a 5th amendment privilege here?

A       No, ma'am.

Q       Okay. So you are saying that anything that inquires into the exercise of your 1st amendment right, you don't have to answer a question pertaining to that?

A       I don't think I made that broad of a statement. I'm saying that the things that I have seen in the depositions that you've inquired about, and the things that I believe you are about to inquire about based upon the filings with the court, which is how I know what you're going to inquire about, by the way, would tell me that you're going to infringe on my rights.  But, again, not relevant to this case, the Court has dismissed all the RICO claims.  All this stuff about conspiracy is gone from this case at this point, so I think we should stick to the issues. That's all I'm saying.

MR. REDMOND:  And just so we're clear, you seem to imply that if you don't pursue each of these individual questions about 28E, and get a non-response, that somehow or another you waive it. I don't think that –

MS. NORA: We don't want to –

MR. REDMOND:  Let me finish. I don't think that that is ever contemplated in the rules. You have got all sorts of issues that remain.

MS. NORA: I don't need to be lectured on that. I do know all of those other issues.

MR. FRERICHS:  I agree with him. I don't think we waive anything by moving on to another area, but I think under these circumstances you need to flesh it out a little bit more as to what exactly

12

we want to address. Should we presume you are operating under a motion under Rule 30D3?

MR. REDMOND: You shouldn't presume any such thing. You should understand that Mr. DeKoter is an experienced trial lawyer. He has read all of the rulings. He has read all of the complaints, and the amended complaints, and the orders in this case. He considers 28E to be irrelevant to the issues in this case at this point, but he acknowledges that there are other issues that the judge has kept alive in the case. I'm not objecting. So I'm not directing him not to answer, but he has told me that he is going to refuse to answer those questions.

MR. FRERICHS: I understand, and I just want to flesh it out with the court's order, so I'm not trying to argue with you. I just want -- so that means that it's not a Rule 33 -- or 30D3 motion that you are acting pursuant to right now, correct?

MR. REDMOND: There is no motion.

MR. FRERICHS: It's also -- there is no current limitation by the Court that you are acting under, is there?

MR. REDMOND: I think the current limitation of the Court is the ruling on the motion to dismiss. The Court has ruled and thrown out RICO, and 28E issues, and I understand that you still think somehow it's relevant, but that's your –

MR. FRERICHS: I understand. I just want to go through -- is there any privilege that you are relying upon at this point?

MR. REDMOND: No.

THE WITNESS: No.

MR. FRERICHS: So basically you're acting to enforce the limitation of the court order on your motion to dismiss? That's the basis for refusing to answer.

THE WITNESS: To be clear, I am making the objection as the witness. I think what you're reading from the order is what Judge Strand

13

says about attorneys. I don't think it implies [sic] to me in any, way, shape or form.

MR. FRERICHS: That's fine. I want to get our record clear so when we do have to parse it with Judge Strand or Judge Bennett we know exactly where we're coming from. I'm not trying to argue with you.

MR. REDMOND: Absolutely.

\* \* \*

Q    So can you point to any portion of Judge Bennett's order of July 17, 2013, upon which you rely to refuse to answer questions about unified law?

A    The part where he dismissed all of the claims about unified law, ma'am.

Q    What makes you think that all of the claims regarding unified law were dismissed? Do you read the complaint as not including paragraphs 1 through 35 -- 1 through 135 as applying to count 1, civil rights?

A    Yes, ma'am. That is how I read it.

Q    So you are saying that even though count 1, civil rights, incorporated by reference paragraphs 1 through 135, that that incorporation was somehow not effectuated?

A    No, ma'am. I'm just saying that the allegations were so completely wild that the judge threw them out.

Q    I see. That's kind of interesting. What is wild about questioning the illegal funding of the government programs?

A    Ma'am, I'm not going to answer questions about the funding of government programs in Osceola County, as I already told you.

Q    What makes you think that if you address these issues your 1st amendment rights to freedom of speech would be impacted?

14

A    I think the reason that this lawsuit is brought in part is because certain people want to silence me. I have spoken out, and they want to shut me up.

DeKoter Tr. 9-22. The discussion continued as follows:

Q.    You just stated that you feel that this lawsuit is brought to silence your exercise of 1st amendment rights. I'm asking you how can citizens silence other citizens' 1st amendment rights? How do they go about doing that?

A    By invoking a court process to compel testimony, and intimidate and annoy and harass somebody.

Q    How many people have you threatened with lawsuits in order to control them in Osceola County?

A    Ma'am, No. 1, your question is argumentative. It assumes something that's not true.

MS. NORA:    Wait a second. Are we going to have the witness do all of your objections? Are you just going to sit here and let him represent himself? Because if so, you know, then I don't see why we even have counsel present, frankly. Is he representing himself right now?

MR. REDMOND:  Are you asking me if I'm making an objection?

MS. NORA: Yes, please.

MR. REDMOND: I'm not making an objection. We have an experienced lawyer here who knows what the issues are in the case.

MS. NORA:    And you are going to allow him to put in his own objections, and you are not going to take control over the process where your client is concerned?

MR. REDMOND:  I think I am maintaining control.

MS. NORA:    By letting him interpose the objections?

MR. REDMOND:  He is answering the question as best he can.

15

THE WITNESS:     That's right.

Q     Are you admitted to practice law before the Northern District of Iowa federal court?

A     I am.

Q     And are you licensed to practice law in the State of Iowa?

A     I am.

Q     And the objections that you are making to the questions I am asking, are you making those as an individual citizen, or as a licensed practitioner of law?

A     I'm here today as a citizen, ma'am. I'm an individual, but I happen to know certain things because I'm a lawyer. So I'm answering as best I can, and trying to stick with the real issues in the case.

*Id.* at 24-26.  And:

Q     So you understand that as a private citizen you should not be using the sheriff's department or the county attorney's office to interfere with the freedom of the Van Stelton plaintiffs to associate with other people in the community who oppose unified law?

A     Wrong question. If we're talking about unified law, ma'am, I told you before it's not relevant here. So please rephrase it.

*Id.* at 27.  The deposition then proceeded for several minutes without incident, until:

Q     Do you know who Paul Dorr is?

A     Yes.

Q     And do you believe that Paul Dorr is a dangerous person?

A     Again, ma'am, I don't think that any of this is relevant, and I'm not going to talk about Paul Dorr today.

Q     So that's your position is you are refusing to answer any questions about Paul Dorr?

16

A    Yes, ma'am, because I don't see what possible relevance it could have. If you want to ask questions and have me make specific objections, ask away.

Q    Okay.

A    Up to you.

Q    How long have you known Paul Dorr?

A    I don't know exactly. Somewhere around the time that I came to Sibley. Maybe a year or two after, but somewhere in there.

Q    And were you and Mr. Dorr once friends?

A    Again, ma'am, that's not relevant.

Q    You are refusing to answer?

A    Yes, ma'am.

MS. NORA:    Counsel, you're letting your client decide that he's not going to answer that question?

MR. REDMOND:  Well, we have four remaining counts: False arrest, malicious prosecution, tortious interference with prospective business advantage, and breach of fiduciary duty. I don't have the foggiest notion how Paul Dorr or Karen Stevenson would have anything to do with those four remaining issues.

MS. NORA:    Is that your place to decide the strategy of how we establish the tortious conduct that we've alleged?

MR. REDMOND:  No, it's not. I'm just telling you that I also don't understand the relevance of it, so it doesn't surprise me that the witness doesn't understand the relevance of it.

MS. NORA: It's not the witness' –

MR. REDMOND: I'm not making an objection, but he does have the right to refuse to answer some things that are totally irrelevant, such as if you tried to go into his marriage life or whatever the case might be. Somebody who he used to represent. I'm not objecting, but you answer – you ask any questions that you want. I just would hope that we would stick to the four remaining issues in the case, which we haven't even touched on yet hardly.

MR. FRERICHS: Credibility and motive are always material.

MR. REDMOND: That's true.

MR. FRERICHS: But you proceed how you want to.

Q  Were you a friend of Paul Dorr's before you had a theological dispute with Paul Dorr?

A  Again, ma'am, I don't see what that has to do with this case.

Q  Are you refusing to answer?

A  I think that's implicit with what I just said, ma'am. You don't need to keep asking that question.

Q  I do have to make my record. Now, does Paul Dorr have anything to do with the Osceola County Taxpayers Association?

A  Not relevant, ma'am. I'm refusing to answer.

*Id*. at 43-46. Later, after a short break, plaintiffs' counsel made an understandable effort to determine what on earth was going on:

MR. FRERICHS: Can I make a little bit of a record before we start? I just want to be clear in looking at Judge Strand's order that as I understand it, you are refusing to answer, and I'm not arguing with that, but you're also not anticipating filing a rule 30(b)(3)motion. Is that my understanding as well?

MR. REDMOND: I don't anticipate filing any motion.

MR. FRERICHS: Okay. Thanks.

18

*Id.* at 48-49.  Plaintiffs' counsel then moved on to other topics that DeKoter deemed acceptable.  As such, the deposition proceeded for much of the remainder of the day without incident.  Late in the day, however, Ms. Nora had to leave the deposition due to back pain.  Mr. Redmond agreed that her co-counsel, Mr. Frerichs, could complete the examination.  *Id.* at 151-54.  It did not take long for him to wander into forbidden territory:

> [Q]  What's your relationship with Osceola County Taxpayers Association?
>
> A  Same objection as before. I'm not going to talk about the OCTA today.
>
> Q  You understand, don't you, that part of the claim that -- at least I think we can agree that's surviving is a 1st amendment claim that they are claiming some government action because of their exercise of their 1st amendment through the Osceola County Taxpayers Association. Would you agree with that?
>
> A  I don't recall that being a claim that's still in this case, no.
>
> Q  So I'm clear, you are not going to talk about anything related to the Osceola County Taxpayers Association?
>
> A  No, I'm not.

*Id.* at 164-65.  And:

> Q  I realize you are probably going to object to this, but have you ever had any contact with Doug Weber regarding the Osceola County Taxpayers Association?
>
> A  I am going to object to that.
>
> Q  Have you ever had any contact with Mr. Hansen about the Osceola County Taxpayers Association?
>
> A  Same objection. Again, I just don't think there is any relevance here.

*Id.* at 168.  And:

    Q    And I apologize, I think this was already asked, but you also don't -- are invoking some kind of, I don't know if it's a privilege or an objection, to talking about Paul Dorr?

    A    Yes.

    Q    Is that accurate?

    A    Relevance, and the same things.

    Q    Again, I apologize for beating a dead horse here, but as I understand it, you are not seeking any kind of protective order. You are just saying, I'm not going to answer those questions?

    A    As of today that's what I'm saying. I'm not making a motion. I'm telling you it's not relevant.

    MR. REDMOND:  If there is some way that you think it's relevant to this, that and the other thing, to an issue that remains in the case, go ahead and say so, but false arrest, interference with -- you know the counts that remain.

    MR. FRERICHS:  Right. And there is also interference basically with the inheritance relationship.

    MR. REDMOND:  The land, the rent.

    MR. FRERICHS:  I understand. But his motive to do that would -- and it had been pled, is based on his ill will towards the Van Steltons and their association with the Osceola County Taxpayers Association. That includes Mr. Dorr, and we think that we should be able to flesh out any potential motive that he may have had for interfering with the inheritance rights of Alvin and Virgil.

    MR. REDMOND:  The fact that he denies.

    MR. FRERICHS:  I understand that, but denial is one thing. Who did he talk to about what concerning the Osceola Taxpayers Association, particularly as it involved the Van Steltons, I think, is relevant to motive,

and I think we should be able to develop that. I think that's potentially --
that is calculated to lead to admissible evidence.

> MR. REDMOND: You mean you're arguing that he was mad at
> Virgil because of his relationship with Mr. Dorr and, therefore, he
> attempted to do something about his inheritance?

> MR. FRERICHS: Among other things, yes. He's upset with the
> Osceola County Taxpayers Association because they are raising issues
> particularly now about the unified law, and how there is a
> disproportionate payment of taxes to Sibley as opposed to the county, and
> the argument that that affects his bottom line.

> MR. REDMOND: All of it's been thrown out by the judge.
> Unless and until he allows it to come back in…

> MR. FRERICHS: I just wanted to make sure we were on the
> same page.

*Id.* at 169-72. And, finally:

> Q   Now, with respect to your job, I guess, as the legal
> representative for the economic development commission -- did I get that
> right?

> A   Yes, sir.

> Q   Have you had the opportunity in that position to take up any
> of the challenges that have come about with respect to Osceola County's
> use of unified law and the tax income?

> A   I'm just going to decline to answer questions about the
> economic development commission. I don't think it's relevant to this case.

*Id.* at 199-200.

To summarize, DeKoter was a party witness who appeared for a deposition by
agreement, and pursuant to a subpoena, and categorically refused to answer questions
about certain topics, including (a) the Unified Law, (b) the Osceola County Taxpayers
Association and (c) his position as counsel for the Osceola County Economic

Development Commission. DeKoter's refusals were immediate. In other words, he did not answer questions about those topics for a period of time and then decide that he was being harassed. When the topic arose, even in connection with the name of an individual associated with the topic (*e.g., Paul Dorr*), DeKoter immediately announced that he would not answer questions about it. While represented by counsel, his refusals to answer were not directed by counsel (although they were clearly endorsed by his attorney). Nor were the refusals based on any claim of privilege or court-imposed limitations. The record shows, unequivocally, that the refusals were based entirely on DeKoter's unilateral decision that certain topics are not relevant to this case. For good measure, this occurred *after* DeKoter and other defendants were unsuccessful in their effort to obtain a pre-deposition protective order concerning those topics.

## IV.    WEBER'S DEPOSITION

Weber's deposition took place the following day. Plaintiffs were again represented by Ms. Nora and Mr. Frerichs. Weber was represented by his attorneys of record, Douglas Phillips and Deena Townley. Weber testified that he has been either a Deputy Sheriff or the elected Sheriff of Osceola County since 1979. *See* Transcript of the August 20, 2013, deposition of Douglas Weber, filed herein as Doc. No. 133-1 (Weber Tr.), at 5-7. To his credit, Weber left the objecting to Mr. Phillips, who got off to a fast start:

> Q [by Ms. Nora]    And did Sheriff Harskamp ever make any comments to you about the difficulties that were arising under the unified law enforcement application?
>
> MR. PHILLIPS:    I'm going to object to that question and instruct him not to answer. The legal issues in this case involve false arrest, malicious prosecution, defamation, and a series of poorly defined constitutional violations, none of which have anything to do with the administration of the unified law. It's history, the 28E agreement or any other matter. Those claims have been dismissed. He is not going to sit

here and be harassed about your theories on why this is calculated to lead to the discovery of admissible evidence.

MS. NORA: And are you going to be moving for a protective order?

MR. PHILLIPS:     Yes, if you continue.

MR. FRERICHS: I guess -- I'm sorry. I want to clarify the record. Based on the objection and your instruction to him not to answer, are you going to be moving for a protective order? You said if she continues. I wonder if you are going to be moving on that based on your objection, and you are advising him to refuse to answer at this point.

MR. PHILLIPS:     Yes, if she continues.   What is it about my answer that you don't understand?

MR. FRERICHS:   Well, I'm wondering if she has to continue to ask in order for you to file a motion.

MR. PHILLIPS:     If she doesn't ask anymore questions about unified law, I'm not going to burn up a bunch of paper to file a motion. If she persists, I will continue to instruct him just as I have for the reasons that I have just articulated, and I will file a motion. I don't know what she has on her outline.

Q       All right. How is the sheriff's department of Osceola County funded?

MR. PHILLIPS:     I have the same objection for the same reasons. The funding of the sheriff's department has nothing to do with whether there was probable cause to arrest Virgil, probable cause to prosecute him, whether the sheriff defamed him when he called Carol, or whether any of these constitutional violations occurred.

Q       Is there a unified law enforcement agreement that covers the funding of the Osceola County Sheriff's Department?

MR. PHILLIPS:     I have the same objection.   He is not going to answer questions about unified law for the reasons that I just stated and, yes, I am going to file a motion for a protective order.

23

Weber Tr. 7-9. Later, this exchange occurred:

Q     Now, with respect to the order of Judge Bennett [in a prior case] that you take a course, let's say, in the constitution with emphasis on the 1st amendment, what did you do to comply with that order?

A     I took an online class.

Q     How much did that class cost?

A     I'm not sure.

Q     Who paid for it?

MR. PHILLIPS:  I object to this as nothing more than harassment. The issue of who paid for his course is not related in any way to the four remaining claims in this case.  It's –

MS. NORA:  It's a civil rights claim.

MR. PHILLIPS:  Don't interrupt me. Nor is it likely to lead to the discovery of admissible evidence. For that reason, I'm instructing him not to answer. You are not going to harass him about this.

MS. NORA:  There is no harassment, sir. I am going to pose my question, and if you shout at me again, I'm going to terminate this deposition and get it continued to a date where you can control yourself.

MR. PHILLIPS:  If you interrupt me, I'll shout.

Q     How long have you known Dan DeKoter?

A     Oh, since he first came to town. Early '80s.

Q     Now, did Dan DeKoter raise funds for you to take your online course in the 1st amendment?

MR. PHILLIPS:   I object for the reasons I just stated, and instruct him not to answer that question.

MR. FRERICHS:   I assume you will seek a protective order?

24

MR. PHILLIPS: Your assumption is correct. Probably not going to get to it until we finish with tomorrow's work, but I will.

*Id.* at 37-38. And:

Q How did Dan DeKoter know that the insurance company was not going to pay for your 1st amendment retraining?

MR. PHILLIPS: I object to this. It is nothing but harassment and for the reasons that I have stated before. Who paid for, or how he paid for -- how it was paid for is not calculated to lead to the discovery of admissible evidence in this case.

MS. NORA: Are you instructing your client not to answer?

MR. PHILLIPS: Yes.

*Id.* at 42. Next, plaintiffs' counsel asked a series of questions based on Weber's counterclaim, in which he contends that certain claims in the third amended complaint are frivolous and that the document was filed for an improper purpose. Specifically, she asked Weber to explain why he contended that certain factual allegations were either frivolous or harassing. *Id.* at 43-134. Weber's counsel repeatedly instructed him not to answer questions about various paragraphs that, in his opinion, relate to claims that are no longer part of the case. *Id.*

Later, the following exchange occurred:

Q What's your annual budget?

MR. PHILLIPS: He is not going to answer questions about his budget, or his allocation of resources because those questions have nothing to do with any of the pending issues in the litigation. It amounts to nothing more than harassment. There is no basis for claiming that it would lead to the discovery of admissible evidence.

Q Do you think that the people that are involved in OCTA are strange?

25

A      No.

Q      Did you attempt to hire your own law firm's associate to be the public safety commissions attorney?

MR. PHILLIPS:      I have the same objection to that question. It has no relationship to the issues in this in case. You are harassing him. He is not going to answer.

Q      Do you know whether an attorney has been appointed to represent the public safety commission?

MR. PHILLIPS:      Same objection.

Q      Are you refusing to answer?

MR. PHILLIPS:      I'm telling him not to.

MS. NORA: And the basis for the objection?

MR. PHILLIPS:      I have already stated the basis for the objection.

MS. NORA: That it's harassment to ask him if –

MR. PHILLIPS:      I have stated the basis for the objection. If you want her to read it back, that's fine.

MS. NORA: Sure. Let's read it back.

(Record read as requested.)

MS. NORA: So legal counsel to the public safety commission is included in that objection?

MR. PHILLIPS:      Yes.

Q      How does legal counsel get appointed for the public safety commission?

A    The public safety commission hires somebody. They don't get appointed. They hire someone.

Q    Did you make any recommendations?

MR. PHILLIPS:    I object to these questions. The public safety commission is not a party. Who represents them, or who he would like them to be represented by has nothing to do with the issues involving the arrest, malicious prosecution, defamation, or the constitution of Iowa. It amounts to nothing more than harassment. It's not reasonably calculated to lead to the discovery of admissible evidence. Don't answer.

*Id*. at 167-69. And:

Q    Why are you so afraid of the allegations of violations of the Iowa Code which pertains to unified law?

MR. PHILLIPS:    Object to the form of the question. It's not calculated to lead to any admissible evidence. Unified law is no longer an issue in this case. Don't answer that question.

Q    Do you think that allegations that the unified law is being illegally administered are crazy?

MR. PHILLIPS:    For the same reason you need not answer that question. There are no such allegations remaining in this case.

*Id*. at 176.  And:

Q    But what about other members of the community? If other members of the community have concerns about unified law, should they be deterred from file [sic] lawsuits?

MR. PHILLIPS:    You don't have to answer that because this case isn't about unified law.

*Id*. at 178.  And:

Q    County attorney didn't tell you that there's a concern that your entire board of supervisors is committing misdemeanor by operating the unified law the way they are operating it?

27

MR. PHILLIPS:  The operation of the unified law is not an issue in this case. Your question is not reasonably calculated to lead to the discovery of admissible evidence. For that reason, I am instructing him not to arrest [sic] that.

Q  So you have not investigated the county board of supervisors for anything?

MR. PHILLIPS:  I am instructing him not to answer.

*Id.* at 210.  And:

Q    Do you agree with Mr. DeKoter's statements in the press about the Osceola County Taxpayers Association?

MR. PHILLIPS:    Object to that.  People's positions on OCTA are not an issue in this case.  They have nothing to do with it, and this is just harassment, and a complete waste of time.  You need not answer.

Q    Do you have a dispute with Osceola County Taxpayers Association about the amount of your budget?

MR. PHILLIPS:  The amount of his budget is not an issue in this case.  You need not answer.

*Id.* at 212.

To summarize, Weber was a party witness who appeared for a deposition by agreement and pursuant to a subpoena.  His attorney repeatedly instructed him not to answer questions about certain topics, including (a) the Unified Law, (b) the Osceola County Taxpayers Association, (c) the Osceola County Public Safety Commission and (d) the sheriff's department's budget.  The instructions not to answer were immediate, meaning that the moment a question contained one of the forbidden phrases, the witness was told not to answer.  Counsel did not permit some initial questions about the allegedly-offensive topics before declaring that those questions were harassing.  Indeed, counsel sometimes based the instruction not to answer solely on relevance, declaring that the question was not reasonably calculated to lead to the discovery of admissible

28

evidence. None of the instructions not to answer were based on any claim of privilege or court-imposed limitations. As with the DeKoter deposition, all of this occurred after Weber unsuccessfully sought a pre-deposition protective order that would have placed certain topics off-limits.[6] Finally, while Weber's counsel stated during the deposition that he would be filing a motion for protective order concerning the questions he instructed Weber not to answer, he did not do so.

## V.    ANALYSIS

### A.    Introduction To Appropriate Deposition Behavior

The Federal Rules of Civil Procedure, and cases applying those rules, provide very clear guidance about how an attorney (and a witness) should behave during a deposition. Rule 30(c)(2) states that a deponent must answer all deposition questions, *even if* his or her attorney objects, unless the attorney expressly instructs the deponent not to answer or moves to suspend the deposition. *See* Fed. R. Civ. P. 30(c)(2). If counsel for a deponent believes that a question is inappropriate, he or she has two choices: object to the question and allow the witness to answer, thus preserving the objection, or instruct the witness not to answer. The second option is appropriate only to (a) preserve a privilege, (b) enforce a court-ordered limitation or (c) bring a motion to terminate or limit the deposition on grounds that it is being conducted in bad faith or in order to unreasonably harass or embarrass the deponent. *See* Fed. R. Civ. P. 30(c)(2) and (d)(3)(A). It is not appropriate to instruct a witness not to answer on the basis of relevance. *See, e.g., Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995); *Rangel v. Gonzalez Mascorro*, 274 F.R.D. 585, 591 (S.D. Tex. 2011); *In Re Stratosphere Corp. Sec. Litig.*, 182 F.R.D. 614, 619 (D. Nev. 1998); *Int'l*

---

[6] Defendant Robert Hansen was deposed the day after Weber. Plaintiffs have not filed a motion for sanctions against Hansen. Indeed, plaintiffs state that Hansen – although represented by the same counsel as Weber – answered questions about the topics that were declared to be forbidden during the DeKoter and Weber examinations. Doc. No. 131-1 at 6-8.

*Union of Elec. Radio and Mach. Workers v. Westinghouse Elec. Corp.*, 91 F.R.D. 277, 280 (D.D.C. 1981).

An attorney may instruct a witness not to answer due to alleged bad faith or harassment only if he or she intends to present a motion for protective order. Fed. R. Civ. P. 30(d)(3)(A); *see also, e.g., Redwood v. Dobson,* 476 F.3d 462, 467-68 (7th Cir. 2007); *Smith v. Logansport Comm. School Corp.*, 139 F.R.D. 637, 643 (N.D. Ind. 1991); *In Re Air Crash Disaster at Detroit Metropolitan Airport*, 130 F.R.D. 627, 629 (E.D. Mich. 1989); *Paparelli v. Prudential Ins. Co. of America*, 108 F.R.D. 727, 730–31 (D. Mass. 1985). In other words, it is not enough for the attorney to instruct a witness not to answer and simply state, as grounds, that the question was posed in bad faith or for purposes of harassment or annoyance. Instead, the attorney issuing the instruction has the burden of making an immediate motion for protective order. *See, e.g., In Re Stratosphere Corp.*, 182 F.R.D. at 619; *Paparelli*, 108 F.R.D. at 731.

None of these principles are new or controversial. Any attorney practicing civil trial law in a federal court should be aware of them. Nonetheless, as noted earlier, I outlined them in my August 16, 2013, order denying defendants' motions for protective order. Doc. No. 119 at 2-3. Among other things, I stated: "For the most part, even if counsel for a deponent is convinced that a question seeks irrelevant information, the correct course of action is to allow the witness to answer." *Id.* at 2. I then explained the above-described rules as to when an attorney is permitted to instruct a witness not to answer. *Id.* at 2-3. Finally, I stated:

> If any attorney determines, in good faith, that a motion under Rule 30(d)(3) is necessary, then he or she can instruct the deponent not to answer the question or questions at issue. The examination should then move on to other topics, with the motion being presented as soon as practicable after the deposition. At that point, at least, there will be a record with one or more specific questions about which the parties may present arguments. Of course, if the motion is denied, and the question(s) at issue deemed appropriate, the examining party would be allowed to reconvene the deposition, most likely at the deponent's expense.

*Id.* at 2-3.

## B. The Explanations

In their resistances, Weber and DeKoter offer diverse arguments as to why plaintiffs' motions should be denied. Weber acknowledges that the standard of relevance with regard to discovery is broader than it is with regard to admissibility. *See, e.g.,* Doc. No. 147-1 at 6. He then outlines the elements of plaintiffs' remaining claims in an effort to demonstrate that Judge Bennett's dismissal of the RICO and OCC claims eliminated any possible reason for discussing the Unified Law, the OCTA and related topics during his deposition. He argues that he cannot be found to have impeded or frustrated the depositions because the questions at issue were not even arguably relevant. Notably missing from Weber's resistance is any meaningful analysis of Rule 30. He cites to and quotes from that Rule, but does not attempt to explain why his attorney's repeated instructions not to answer questions, when combined with a failure to file a motion for protective order, were in compliance with that rule.

DeKoter takes a different approach. He alleges that plaintiffs' motion against him is procedurally improper because the court had not, prior to his deposition, issued an order under Rule 37(a) requiring him to answer questions about the topics he refused to discuss. As such, he claims, he was not in violation of any court order and cannot be assessed sanctions under Rule 37(b). He also argues that although he did not file a motion for protective order during, or immediately after, his deposition, he has not waived his right to do so. Finally, he argues that he was not in contempt of court because he appeared for his deposition and his refusal to answer questions was based on his "good faith objection to some of the discovery sought by Plaintiffs." Doc. No. 150-1 at 4. Because (according to DeKoter), the topics at issue are not relevant, he could not have impeded the discovery process.

## C.     Did DeKoter And Weber Violate The Rules Of Procedure?

This is an easy question.  The answer is:  "Of course."  As noted above, it is black-letter law that relevance is not an appropriate basis for an instruction not to answer (or for a refusal to answer).  Couching the instruction or refusal in terms of "harassment" does not change the analysis when the cry of "harassment" is based solely on an argument that certain topics are not relevant.

Clearly, inquiry into irrelevant topics can constitute bad faith, or unreasonable annoyance, embarrassment or oppression, as described in Rule 30(d)(3).  For example, asking a deponent questions about personal or confidential matters, such as his or her medical history, sex life or financial condition, would quickly qualify if such matters had no possible relevance to the case.  Here, while the topics at issue might be of questionable relevance in light of the surviving claims, they are not so sensitive or obnoxious that any inquiry into them immediately amounted to bad faith, unreasonable annoyance, etc.  Testimony about the Unified Law, the OCTA and similar topics would serve, at minimum, to provide context for plaintiffs' theories as to the defendants' alleged motives.  Given that the plaintiffs still have surviving claims for alleged violations of their constitutional rights, I cannot make a bright-line finding that evidence about possible motives is plainly irrelevant.

This is why I expressly rejected the defendants' pre-deposition motions for protective orders that would have placed certain broad topics off limits.  Because the scope of discovery is broad, I could not state that certain topics are *per se* improper.  Questions about those topics could *become* improper over the course of a deposition if, for example, they proceeded *ad nauseam* or were posed in a hostile and offensive manner.

Unfortunately, DeKoter (cheered on by his counsel) and Weber (through his counsel) decided to take matters into their own hands.  Having failed to procure a court order imposing subject matter limits on their depositions, they imposed their own

limits. They repeatedly refused to answer questions they unilaterally deemed to be irrelevant. Making matters worse, they did not bother to comply with Rule 30(c)(2), or my prior order, by making a motion for protective order upon refusing to answer questions. This conduct was blatantly improper.

Finally, I must address DeKoter's bizarre, "I'm in charge" theory. Because my August 16, 2013, order summarizing Rule 30 spoke in terms of what an *attorney* could do during a deposition, DeKoter and his counsel decided that the rules do not apply to the *witness*. Thus, they took the position that DeKoter, as the witness, could assert his own objections and make his own decisions about which questions he would answer. Indeed, counsel repeatedly stressed that *he* was not making any objections, was not instructing his client not to answer, and had no intention of filing a motion for protective order pursuant to Rule 30(d)(3).[7] Instead, according to both DeKoter and his counsel, it was *DeKoter* who was making objections and deciding not to answer. They either (a) somehow thought this made it okay or, more likely, (b) knew it was improper and did it anyway because DeKoter did not want to answer questions about certain topics. I say "more likely" because I find it hard to believe that DeKoter and his counsel, pooling their collective legal acumen, actually concluded that a deponent can freely choose not to answer questions whenever he or she feels like it.[8]

---

[7] Among the many things about this situation that I find nonsensical is DeKoter's current argument, as described in his resistance, that he has not waived the right to file a motion for protective order about the questions and topics at issue. He *still* has not filed such a motion, so the point of making this argument is lost on me. Moreover, during his deposition he repeatedly stated (usually through counsel, when his counsel chose to speak) that he was *not* going to file such a motion. If the issue of waiver even matters – and I have no idea why it does – I find that DeKoter waived the right to file a motion for protective order by not only letting over 45 days pass after his deposition without filing it, but also by declaring on the record that he was electing not to do so.

[8] I somehow doubt DeKoter or his counsel would take this position if they were deposing an opposing party and the deponent refused to answer questions based on alleged irrelevance.

Regardless of subjective intent, the scheme DeKoter and his counsel concocted to have the objections and refusals come from the witness instead of the lawyer does not change the analysis. For reasons that should be obvious, a represented deponent may not interpose his or her own objections and decide which questions to answer. *See, e.g., GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 191 (E.D. Pa. 2008). That is the attorney's role. Indeed, the express language of Rule 30(c) applies to any participant in the deposition, not just the attorney for the deponent:

> *Objections*. **An objection** at the time of the examination—whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition— must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection. **An objection** must be stated concisely in a nonargumentative and nonsuggestive manner. **A person** may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).

Fed. R. Civ. P. 30(c)(2) [emphasis added]. The fact that DeKoter, rather than his counsel, was the participant making objections and declaring a refusal to answer questions does not excuse the blatant misconduct.[9]

To conclude, DeKoter's and Weber's repeated refusals to answer questions about particular topics were grossly improper. The questions they refused to answer did not rise to the level of bad faith, or unreasonable annoyance, embarrassment or oppression. Nor did either defendant seek a protective order upon refusing to answer, as required by Rule 30(c)(2).

---

[9] This is true regardless of DeKoter's status as a licensed attorney. Throughout the deposition, he (and his counsel) asserted inconsistent positions as to whether that status mattered. On the one hand, DeKoter stated that he was "here today as a citizen," not as a lawyer. DeKoter Tr. 26. He also asserted, remarkably, that he was "in charge" because he was the "client." *Id.* at 11. On the other hand, DeKoter and his counsel repeatedly referred to DeKoter's status as an attorney in explaining why he was making objections as the witness. *See, e.g., Id.* at 14, 18, 25, 26. DeKoter is a party to this case who appeared at the deposition – pursuant to agreement and a subpoena – as the witness.

34

### D.    What Is The Appropriate Relief?

For starters, I must address DeKoter's argument that no relief is appropriate because sanctions under Rule 37(b) are not available unless a party violates an order compelling discovery that was issued under Rule 37(a). This argument ignores two things. First, plaintiffs invoked *both* Rule 30(d)(2) *and* Rule 37(b) in describing the sanctions available against DeKoter. *See* Doc. No. 131-1 at 10. Even if sanctions under Rule 37(b) were unavailable, Rule 30(d)(2) would still be in play.

Second, my order (Doc. No. 119) of August 16, 2013, in which I refused to declare certain topics to be off-limits and summarized the rules regarding the refusal to answer questions during a deposition, easily qualifies as a discovery order that DeKoter violated during his deposition. DeKoter's attempt to escape the consequences of his improper conduct by hiding behind a procedural argument is baseless.

In any event, I find that it is not necessary to delve into Rule 37 because Rule 30(d)(2) applies squarely to this situation. It provides that "[t]he court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." *See* Fed. R. Civ. P. 30(d)(2). To say that DeKoter and Weber impeded, delayed and frustrated plaintiffs' efforts at a fair examination is putting it rather mildly. I find, with ease, that sanctions pursuant to Rule 30(d)(2) are necessary and appropriate. Having considered various sanctions, I conclude that all of the following are required in order to cure the prejudice DeKoter, Weber and their counsel caused to the plaintiffs:

### 1.    New Depositions

Plaintiffs shall have the opportunity to re-depose DeKoter and Weber, as follows:

> a.    DeKoter and Weber shall each re-appear for another deposition (the "new DeKoter deposition" and the "new Weber

deposition") on a date to be agreed upon by DeKoter's counsel, Weber's counsel and plaintiffs' counsel, but in no event later than <u>November 10, 2013</u>. Both new depositions shall occur on the same day, as discussed further below. The location shall be the same as that of the prior DeKoter and Weber depositions, unless DeKoter's counsel, Weber's counsel and plaintiffs' counsel agree to another location.

b. The new DeKoter deposition shall begin at 9:00 a.m. on the agreed date and shall last no more than three (3) hours (exclusive of breaks and of questioning by any defense counsel). It shall be limited to questions and topics that plaintiffs' counsel believes, in good faith, were placed off-limits by DeKoter during his initial deposition.

c. The new Weber deposition shall begin one hour after the conclusion of the new DeKoter deposition, unless DeKoter's counsel, Weber's counsel and plaintiffs' counsel agree to a different start time. It shall last no more than three (3) hours (exclusive of breaks and of questioning by any defense counsel) and shall be limited to questions and topics that plaintiffs' counsel believes, in good faith, were placed off-limits by Weber during his initial deposition.

d. When the date and other details concerning the new DeKoter deposition and new Weber deposition have been determined, plaintiffs' counsel shall serve appropriate deposition notices and shall submit copies of those notices to my chambers via email, directed to Leslie_Walker@iand.uscourts.gov.

e. During both of the new depositions, the deponents and their counsel shall comply fully with the legal authorities and principles described in this order, including but not limited to Federal Rule of Civil Procedure 30(c)(2). The deponents shall make no objections. Counsel for each deponent may make appropriate objections for the record but shall not instruct the deponent not to answer a question except under the narrow circumstances described in Rule 30(c)(2). Each deponent and his counsel shall keep in mind that I have imposed a time limit on the new deposition and, further, I find that the topics the deponents refused to discuss during their initial depositions are not so clearly out-of-bounds as to entitle them to a protective order. As such, any instruction not to answer (or refusal to answer) will be examined closely.

36

## 2. *Joint Expenses Of The New Depositions*

Based on the allocation I will set forth below, plaintiffs are entitled to reimbursement for the following joint expenses of the new depositions:

> a. The actual and reasonable travel expenses incurred by Ms. Nora and Mr. Frerichs to drive to and from the location of the new depositions, which shall include meal expenses, mileage at the IRS rate of 56.5 cents per mile and up to one (1) night of a hotel room each for Ms. Nora and Mr. Frerichs.

> b. The actual and reasonable attorney fees incurred by Ms. Nora and Mr. Frerichs for time spent driving to and from the location of the new depositions, and time spent by Ms. Nora and Mr. Frerichs attending those depositions.

> c. Up to a total of three (3) hours of attorney preparation time, combined, for the two depositions. Ms. Nora and/or Mr. Frerichs may devote as much time to preparation as they deem necessary, but no more than three (3) hours will be reimbursed.

With regard to these joint expenses, responsibility for payment shall be split equally between Daniel DeKoter, James Redmond and Douglas Phillips. Each shall personally pay one-third of the above-listed joint expenses. Douglas Weber shall not be required to pay any portion of the expenses, either directly or indirectly, because his refusals to answer were directed by his counsel. Plaintiffs' counsel shall direct a combined, itemized invoice for the joint expenses to the attention of Mr. Redmond and Mr. Phillips no later than fourteen (14) days after the new depositions have been completed. Mr. Redmond and Mr. Phillips shall arrange for payment of the appropriate amounts by the appropriate individuals no later than thirty (30) days after the invoice is issued. If there are disputes concerning the invoice, counsel shall make vigorous good faith efforts to revolve those disputes. If those efforts fail, plaintiffs' counsel may file an appropriate motion seeking resolution of the dispute(s).

### 3. Separate Expenses Of The New Depositions

Daniel DeKoter and James Redmond shall each personally pay one-half of the court reporter's fees for reporting the new DeKoter deposition, including the cost of preparing the original transcript of that deposition. The original transcript shall be delivered to plaintiffs' counsel. All defendants may order and pay for copies as they see fit.

Douglas Phillips shall personally pay all of the court reporter's fees for reporting the new Weber deposition, including the cost of preparing the original transcript of that deposition. The original transcript shall be delivered to plaintiffs' counsel. All defendants may order and pay for copies as they see fit.

### 4. Attorney Fees Incurred In Preparing The Motions For Sanctions

Daniel DeKoter and James Redmond shall each personally pay one-half of the actual and reasonable attorney fees arising from the time spent by Ms. Nora and/or Mr. Frerichs in preparing and presenting plaintiffs' motion (Doc. No. 131) for sanctions against DeKoter. Plaintiffs shall file an itemized request for those fees on or before October 21, 2013. Any objections to that request must be filed by November 4, 2013.

Douglas Phillips shall personally pay the actual and reasonable attorney fees arising from the time spent by Ms. Nora and/or Mr. Frerichs in preparing and presenting plaintiffs' motion (Doc. No. 133) for sanctions against Weber. Plaintiffs shall file an itemized request for those fees on or before October 21, 2013. Any objections to that request must be filed by November 4, 2013.[10]

---

[10] Plaintiffs have requested other relief, such as a 120-day extension of the trial date and other deadlines. I find that these additional measures are not necessary at this time. If the new depositions ordered herein generate information that causes plaintiffs' counsel to believe, in good faith, that additional discovery is necessary, they may file a motion for such relief after the depositions. They will, of course, bear the burden of explaining why the additional proposed discovery could not have been completed despite the obstructionist tactics addressed in this order. As for the defendants' pending motions for summary judgment, plaintiffs may

### E.    Plaintiffs' Request For Contempt Sanctions

I deny plaintiffs' request for additional, contempt of court sanctions at this time, as I believe that the Rule 30(d)(2) sanctions imposed by this order are sufficient to remedy the effects of the misconduct at issue and to deter further violations.  I will, however, revisit the issue of contempt sanctions if the deponents and/or their counsel engage in improper, obstructionist conduct during the remainder of this case.

## VI.    CONCLUSION

For the reasons explained above, plaintiffs' motions (Doc. Nos. 131 and 133) for discovery sanctions are **granted.**  Sanctions are hereby imposed as described in this order.

Plaintiffs' related request for contempt of court sanctions is **denied**.


**IT IS SO ORDERED.**

**DATED** this 9th day of October, 2013.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE

---

request relief pursuant to Federal Rule of Civil Procedure 56(d) if they contend that specific information from the new depositions is likely to be material to their resistances.